IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| JEFFREY P GOTTRON, | CASE NO. 3:22-cv-123 |
| Plaintiff, | DISTRICT JUDGE JAMES G. CARR |
| vs. | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Jeffrey Gottron filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits and Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

## Procedural history

In November 2020, Gottron filed applications for Disability Insurance Benefits and Supplemental Security Income alleging a disability onset date of October 27, 2020, and claiming he was disabled due to strokes, Moyamoya disease, a heart condition (aorta), a drop foot (left side), fatigue, seizures, limited left side mobility, slurred speech, memory loss, lack of memory

retention, hearing issues and vertigo, depression, anxiety, mood swings, high blood pressure, panic attacks, chest pains, and shortness of breath.[1] Tr. 65, 246, 420, 308, 623, 762. The Social Security Administration denied Gottron's application and his motion for reconsideration. Tr. 104-122. Gottron then requested a hearing before an Administrative Law Judge (ALJ). Tr. 130.

The ALJ held an administrative hearing in September 2021. Gottron and vocational expert Courtney Clem testified. Tr. 30-62. In October 2021, the ALJ issued a written decision finding that Gottron was not disabled. Tr. 13-29. The ALJ's decision became final on December 13, 2021, when the Social Security Administration's Appeals Council declined further review. Tr. 1-6; *see* 20 C.F.R. § 404.981.

Gottron filed this action on January 23, 2022. Doc. No. 1. He asserts the following assignments of error:

1. The ALJ erred when her residual functional capacity (RFC) failed to include the fact that Gottron had residual loss of his left upper extremity as a result of his neurological impairments which affected his ability to engage in substantial gainful activity on a full-time and sustained basis.[2]

---

[1]     "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.,* 193 F.App'x 422, 425 (6th Cir. 2006).

[2]     An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard c. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it is the Social Security Agency's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

2

2. The ALJ erred when her RFC failed to include the fact that Gottron had residual loss of his left upper extremity as a result of his neurological impairments which affected his ability to engage in substantial gainful activity on a full-time and sustained basis.

3. The ALJ erred in her analysis of the totality of Gottron's impairments.

4. The ALJ erred when she failed to properly consider Gottron's symptoms pursuant to Social Security Ruling 16-3p.

**Evidence**

*1.  Personal and vocational evidence*

Gottron was born in 1989 and was 31 years old on the alleged onset date. Tr. 33, 37. He has a high school education and previously worked as a house builder and as a handyman in the field of home construction, completing odd jobs such as roofing, flooring, and installing windows and siding. Tr. 37-40, 247. He also previously worked for a flooring company laying tile floors. Tr. 41.

*2.  Medical evidence[3]*

Since suffering a cerebral vascular accident,[4] or stroke, in 2015, Gottron

---

[3]     The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

[4]     Cerebrovascular "pertain[s] to the blood vessels of the cerebrum, or brain." Dorland's Illustrated Medical Dictionary 333 (32nd ed. 2012). Cerebrovascular accident is defined as "stroke syndrome," which is "a condition with sudden onset caused by acute vascular lesions of the brain, such as an infarction from hemorrhage, embolism, or thrombosis, or rupturing aneurysm." *Id.* at 10, 1849. "It may be marked by any of a variety of symptoms reflecting the focus of infarction or hemorrhage, including hemiparesis, vertigo, numbness, aphasia, and dysarthria; it is often followed by permanent neurological damage. *Id.* at 1849. It is also "[c]alled … cerebrovascular accident and stroke." *Id.*

3

has suffered from seizures as well as weakness in his left lower extremity.[5] Tr. 309, 312.

In October 2020, Gottron was admitted to Promedica Toledo Hospital following a seizure which caused limited mobility in his left hand, weakness in his left arm, slurred speech, and a decrease in his concentration and memory. Tr. 262, 312, 420. Gottron's assessment lists evidence of a multifocal stroke in his right middle cerebral artery (MCA) secondary to stenosis[6] in his right MCA, seizure, a history of post-stroke seizures as well as cryptogenic[7] right MCA cerebrovascular accident with mild residual left lower extremity weakness. Tr. 346. Gottron was admitted at Promedica Toledo Hospital for 9 days in October and November 2020, for treatment related to recurrent right MCA stroke secondary to multivessel intracranial stenosis, possible Moyamoya disease,[8] and history of right MCA stroke. Tr. 417. The record also notes Gottron's

---

[5]   This weakness in Gottron's lower left extremity is also referred to as a "foot drop" throughout the record. *E.g.*, Tr. 321.

[6]   Stenosis is "an abnormal narrowing of a duct or canal." Dorland's Illustrated Medical Dictionary 1769 (32nd ed. 2012).

[7]   Merriam-Webster's online dictionary defines cryptogenic as "of obscure or unknown origin." *See* https://www.merriam-webster.com/dictionary/cryptogenic (last visited Sept. 28, 2022).

[8]   According to the Mayo Clinic's online Diseases & Conditions database, "Moyamoya disease is a rare blood vessel (vascular) disorder in which the carotid artery in the skull becomes blocked or narrowed, reducing blood flow to [one's]                                    brain."                        *See* https://www.mayoclinic.org/diseasesconditions/moyamoyadisease/ symptoms - causes/syc-20355586 (last visited Sept. 23, 2022).

hypertension and a history of smoking. Tr. 417. Prior to his hospitalization at Promedica Toledo Hospital in October 2020, Gottron had not suffered a seizure in 14 months. Tr. 417.

Following his discharge in November 2020, Gottron developed anxiety and panic attacks. Tr. 260, 268, 307-308. In early December 2020, he sought emergency medical treatment at Promedica Memorial Hospital Fremont for shortness of breath and chest pain. Tr. 308-12. He was evaluated by Dr. Todd Brookens and discharged the same day. Tr. 308-312, 526. Gottron indicated he had experienced 3 intermittent episodes of chest pain in approximately one week and has "anxiety with his health conditions." Tr. 308, 312, 523. Dr. Brookens diagnosed Gottron with dyspnea, unspecified type, and anxiety; during his physical examination of Gottron, Dr. Brookens described Gottron's range of motion as normal. Tr. 311, 526.

From November 2020 until July 2021, Gottron attended physical therapy to treat his left upper extremity. Tr. 656-694, 790-868, 909-943.

Throughout December 2020, during regular appointments with physical therapist Thomas Hallett of PT Link LLC Oak Harbor, Gottron indicated improvement to his upper left extremity while noting a lack of dexterity in his individual fingers. Tr. 656-694, 863. During various December 2020 appointments, he indicated he could tell his hand was getting stronger as he played tug-of-war with his dog, but still lacked dexterity in his fingers. Tr. 656, 662. He indicated sensation had still not returned and complained of weakness.

Tr. 662. He reported that his arm was getting stronger but noted continued difficulty using his fingers individually. Tr. 863.

On December 22, 2020, Gottron attended a follow-up appointment for hypertension, anxiety, heart palpitations, and a depression screen with Thomas Stein, PA-C, at Community Health Services in Fremont. Tr. 623. During the appointment, Gottron reported improvement in his breathing issues and anxiety. Tr. 623. The source of his anxiety had previously been primarily attributed to his health conditions. Tr. 308.

On December 30, 2020, Richard Burgess, MD, of Promedica Neuroscience Center Physicians noted Gottron had recurrent right hemispheric infarct in the setting of a right internal carotid artery intracranial stenosis, secondary to Moyamoya disease. Tr. 745. Gottron reported that his fingertips and left hand were numb, and that he occasionally had difficulty with his speech. Tr. 745.

In January 2021, Christopher Hassett, DO, of Advanced Neurological Associates diagnosed Gottron with partial onset epilepsy, noting his last seizure was in May 2019 and that he also suffered from hypertension, Moyamoya disease, and anxiety. Tr. 696-697, 715-716.

During physical therapy with Thomas Hallett of PT Link Oak Harbor in early February 2021, Gottron mentioned continued improvement in his left hand though he admitted feeling residual weakness as well. Tr. 843. He reported he continued to feel he was getting stronger but lacked individual

finger dexterity. Rt. 843. Physical therapist Hallett's notes indicate Gottron would require skilled therapy to restore his prior level of function "utilizing the treatment and modalities described in this plan of care." Tr. 843. The problems for which Gottron was attending physical therapy were listed as "weakness, decreased [range of motion], decreased joint mobility, and decreased functional use" of his left upper extremity. Tr. 843-844.

Gottron attended a follow-up appointment with Advanced Neurological Associates in late March 2021, during which he denied having any stroke-like symptoms and reported that his mood was improving. Tr. 755.

In mid-April 2021, during physical therapy, Gottron said he felt approximately 80% better and noted improvement in his fingers and wrist even as he mentioned lingering issues with range of motion and strength. Tr. 802. He mentioned noticeable weakness during daily activities. *Id*. The clinician conducted physical tests on Gottron's left upper extremity that reflected reduced wrist extension and moderate restrictions in the dorsal and ventral glides in Gottron's left wrist. Tr. 803.

Also in mid-April 12021, Gottron attended a follow-up appointment with Dr. Burgess during which he reported trying to work 2 to 3 hours "here and there" but found this caused the return of stroke symptoms in his left hand and leg, "causing him to trip and fall." Tr. 758. Dr. Burgess referred to these

symptoms as paresis.[9] Tr. 758. As part of Dr. Burgess's treatment plan for Gottron's "recurrent right MCA territory ischemic[10] stroke secondary to" Moyamoya disease, Dr. Burgess advised Gottron to "stay off work" and suggested that Gottron apply for short-term disability benefits. Tr. 762. Dr. Burgess also set forth treatment plans for Gottron's hypertension, reactive depression, and seizures. Tr. 763.

During physical therapy in late April 2021, Gottron indicated that he was suffering from weakness and decreased functional use of his left hand. Tr. 790-791.

Gottron underwent physical testing of his upper left extremity in May 2021. Tr. 941-943. The results reflected a 10 percent reduction in the extension of his left wrist, classified as 3+ out of 5, and moderate restrictions in the dorsal and ventral glide of his radiocarpal joint.[11] Tr. 942.

In June 2021, Gottron attended a follow-up appointment for hypertension with PA-C Stein at Community Health Services in Fremont. Tr.

---

[9]     Merriam-Webster's online dictionary defines paresis as "slight or partial paralysis." *See* https://www.merriam-webster.com/dictionary/paresis (last visited Sept. 28, 2022).

[10]     Ischemia is "deficiency of blood in a part, usually due to the functional constriction or actual obstruction of a blood vessel." Dorland's Illustrated Medical Dictionary 961 (32nd ed. 2012).

[11]     "The wrist is a joint complex comprised of three other joints: the radiocarpal joint, the ulnocarpal joint, and the distal radioulnar joint (DRUJ)." National Library of Medicine's *Anatomy, Shoulder and Upper Limb, Hand Radiocarpal Joint*, Introduction. *See* https://www.ncbi.nlm.nih.gov/books/ NBK539744/ (last visited Sept. 28, 2022).

869-874. PA-C Stein noted that, at that time, Gottron was active at work in construction and was experiencing slower and slurred speech "if he gets talking fast." Tr. 872. PA-C Stein conducted a mental status examination of Gottron and assessed as normal Gottron's attention span and ability to concentrate. Tr. 873.

During physical therapy in July 2021, Gottron indicated he was still suffering from weakness and decreased functional use of his left hand. Tr. 910. And at a July 2021 follow-up appointment with Christopher Hassett, DO, for partial onset epilepsy, Gottron indicated that he was experiencing fatigue during the day and sleeping 5 hours each night. Tr. 781. Gottron denied experiencing any stroke-like symptoms. Tr. 781.

### 3. *State agency opinions*[12]

In February 2021, Karla Delacour, PhD, reviewed Gottron's record, considered Listing 12.06, Anxiety and Obsessive-Compulsive Disorders, and found that while a medically determinable impairment was present, Gottron

---

[12] When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

did not satisfy the listing.[13] Tr. 65-68. Dr. Delacour found Gottron limited in his ability to interact with others, concentrate, persist, or maintain pace, and to adapt or manage himself. Tr. 72. In early April 2021, during reconsideration, a second State Agency examiner affirmed Dr. Delacour's findings. Tr. 89.

In February 2021, Diane Manos, MD, reviewed Gottron's record and considered Listings 11.02, Epilepsy; 11.04, Vascular Insult to the Brain; and 12.06, Anxiety and Obsessive-Compulsive Disorders. Tr. 66-71. Dr. Manos found that Gottron did not satisfy any listing and could perform work at a medium level of exertion with postural and environmental limitations. Tr. 70-74, 72-73, 80-81. In early April 2021, Dana Schultz, MD, affirmed Dr. Manos' findings. Tr. 98-101.

### 4. Hearing testimony

In September 2021, the ALJ held a hearing at which Gottron, who was represented by counsel, and a vocational expert testified. Gottron indicated that he lives alone in a second-floor, walk-up apartment. Tr. 42-43. He is right-handed. Tr. 46. Every now and then, he mops his kitchen and bathroom floors. Tr. 43. Most of the time, he needs help changing his bed sheets. Tr. 43. Gottron can wash and dry his laundry but requires his mother's help to fold his clothes.

---

[13]     The "listings" are found at 20 C.F.R Part 404, Subpart P, App. 1. They are a catalog of disabling impairments organized by "body systems." Generally, each *body system* section has an *Introduction*, which contains information relevant to that system, and a *Category of Impairments*, which contains each numbered listing. Each listing describes the objective medical and other findings needed to satisfy the criteria of that listing. *Id*.; 20 C.F.R. § 404.1525.

Tr. 43, 49. He can heat up meals for himself but relies on his mother to cook anything beyond the capabilities of his microwave. Tr. 42, 49, 256. He frequently becomes fatigued during the day. Tr. 44-45. Gottron would prefer not to drive though he will if necessary; for example, he recently drove because he needed to go to the gas station. Tr. 42. Gottron has panic attacks if he drives too much. Tr. 42. He can shop for his own groceries but because he suffers anxiety around large crowds of people, his mother usually does his food shopping. Tr. 45, 257, 259, 265. Gottron's mother drives him to his doctor's appointments as well. Tr. 49.

Gottron's medications make him dizzy and sleepy; he loses his balance every few days due to this dizziness. Tr. 48. If Gottron stands or walks for less than a half hour, his left foot drops, leading him to drag his left foot. Tr. 50-51. This causes him to trip which, combined with the limited use of his left upper extremity, renders him unable to catch and steady himself with his left hand. Tr. 50. Gottron's condition has caused him to fall a few times traversing the stairs leading to his apartment. Tr. 50. Eventually, pain emanates upward from Gottron's foot through his knee and into his thigh, at which point he needs to rest. Tr. 51. The limitations of his left hand also make it difficult for Gottron to complete tasks such as washing himself, applying deodorant, pouring himself a drink, putting on his socks, tying his shoes, washing his dishes and silverware, tightening a belt, or putting on a shirt, sweater, or jacket. Tr. 51-52.

11

On occasion, Gottron struggles to produce words and needs to start over while speaking. Tr. 52-53. More frequently, Gottron simply struggles to find words. Tr. 53. He has difficulty retaining new information and forgets things from one day to the next. Tr. 53. Gottron used to enjoy reading but no longer reads since he loses his place and must start over. Tr. 44. This also happens when he watches television. Tr. 44. He used to enjoy hunting but can no longer safely grip a gun; as a result, he does not plan to continue hunting. Tr. 46. Gottron's brother assists Gottron financially and physically, regularly bringing items into Gottron's apartment for Gottron and putting them away. Tr. 50. Socially, Gottron enjoys watching football and baseball with his brother as well as spending time with him at a local hunting club. Tr. 47-48.

Vocational expert Courtney Clem also testified at the hearing.[14] Tr. 54-61. Ms. Clem discussed Gottron's past work history. Tr. 55-56. For purposes of a series of hypothetical inquiries, the ALJ asked Ms. Clem to focus on Gottron's past work as a construction worker. Tr. 56. The ALJ then asked Ms. Clem whether a hypothetical individual the same age and with the same level of education as Gottron could perform his past work or any other work at a

---

[14]     A vocational expert's testimony "is directed solely to whether, given a claimant's age, experience, and education, along with the ALJ's assessment of what the claimant 'can and cannot do," there exist a significant number of employment opportunities for the claimant in the regional and national economies." *Webb*, 368 F.3d at 633. The vocational expert considers the claimant's residual functional capacity, "'age, education, and work experience' and assess whether the claimant 'can make an adjustment to other work.'" *Id.* (quoting 20 C.F.R. § 416.920(a)(4)(v)).

medium level of exertion if the individual had the limitations assessed in the ALJ's residual functional capacity determination, including frequent handling and fingering with his non-dominant hand. Tr. 56-57. Ms. Clem answered that such an individual could not perform Gottron's past work but could perform the following representative jobs in the economy: laundry worker, salvage laborer, or machine feeder. Tr. 56-57. The ALJ next asked Ms. Clem whether that same hypothetical individual could perform Gottron's past work or any other work at a light level of exertion. Tr. 57. Ms. Clem answered that such an individual could not perform Gottron's past work but could perform the following representative jobs in the economy: garment sorter, inspector and hand packer, and price marker. Tr. 57. If such a person were limited to no public contact and only occasionally handling and fingering with his non-dominant upper extremity, Ms. Clem testified that such limitations would rule out all jobs. Tr. 59.

### The ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2025.

2.  The claimant has not engaged in substantial gainful activity since October 27, 2020, the alleged onset date (20 C.F.R 404.1571 *et seq*., and 416.971 *et seq*.).

3.  The claimant has the following severe impairments: status-post 2015 cerebral vascular accident (CVA) with an October 2020 multifocal infarcts in the right middle cerebral artery (MCA) distribution superimposed on old right MCA infarct; Moyamoya disease; hypertension;

epilepsy; and anxiety (20 C.F.R. 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    The claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c) except: the claimant cannot climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; and frequently balance, crouch, kneel, stoop, and crawl. With the non-dominant left upper extremity, he can frequently handle and finger. The claimant cannot work around unprotected heights, unprotected moving mechanical machinery, or heavy machinery. He cannot perform any commercial driving. The claimant can understand, remember, and carry out work tasks, but not at a production rate pace such as working on an assembly line, and can respond to usual work situations where duties are generally static with occasional changes in work tasks. He cannot perform work that requires a daily production quota, i.e., piecework, but can perform goal-oriented work and meet end-of-day production requirements; that includes remaining on task for 2-hour segments of time. He can have occasional interaction with the general public, supervisors, and coworkers.

6.    The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7.    The claimant was born on October 5, 1989[,] and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8.    The claimant has at least a high school education (20 C.F.R. 404.1564 and 416.964).

9.    Transferabilty of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that

the claimant is "not disabled," whether or not the claimant has transferable job skills (*see* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 27, 2020 through [October 18, 2021] (20 C.F.R. 404.1520(g) and 416.920(g)).

Tr. 13–29.

### Standard for Disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

15

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if

supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

**Discussion[15]**

**The ALJ did not err at step three.**

*Listing 11.04.* Gottron argues that the ALJ erred when in her RFC analysis, she "failed to include the fact that Gottron had residual loss of his left upper extremity as a result of his neurological impairments which affected his

---

[15]     Gottron reiterates several issues and assignments of error in section headings unsupported by arguments under the headings. Doc. No. 7, p. 8, 13, 16. He raises several arguments unacknowledged by the section headers included above. *E.g.*, Doc. No. 7, p. 12, 13-15. Accordingly, the Court has addressed the substance of Gottron's arguments without adherence to his brief's structure. To the extent that Gottron raised issues unsupported by any argument, those issues are waived. *See United States v. Layne*, 192 F.3d at 566, (quoting *McPherson v. Kelsey,* 125 F.3d 989, 995-996 (6th Cir. 1997)).

ability to engage in substantial gainful activity on a full-time and sustained basis." Doc. No. 7, p. 1. He asserts that the residual weakness in his left upper extremity is related to his 2015 CVA and October 2020 multifocal stroke in his right MCA secondary to stenosis in his right MCA,[16] and that it is "unclear how the ALJ determined the combination of Gottron's severe impairments allowed him to engage in substantial gainful activity on a full-time and sustained basis." Doc. No. 7, p. 8; Doc. 6, p. 3. Plaintiff's argument fails because substantial evidence supports the ALJ's conclusion that while the 2015 CVA and October 202 stroke were two of Gottron's severe impairments, Gottron did not meet 20 C.F.R Pt. 404, Subpart P, App. 1, Sections 11.04, 12.06, and 11.02.

At step three of the disability evaluation process, a claimant will be found disabled if his impairments meet or equal one of the entries in the Social Security Administration's listing of impairments. 20 C.F.R. § 404.1520(a)(4)(iii). "[A] claimant is also disabled if her impairment is the *medical equivalent* of a listing[.]" *Id.* (emphasis in original). Gottron purports to challenge the ALJ's step three finding with respect to the combination of his neurological impairments in combination with the upper left extremity weakness he experienced after his October 2020 stroke. Doc. No. 7, p. 8. He

---

[16] Gottron refers to this severe impairment as his "October 2020 MCA." Doc. No. 7, p. 8. But the term "MCA" does not refer to an impairment; it is, as previously noted, an abbreviation for "middle cerebral artery." The Court assumes that by "October 2020 MCA," Gottron intends to reference Gottron's October 2020 multifocal stroke, which occurred in his MCA secondary to stenosis in his right MCA.

does not cite or challenge, however, the ALJ's step three finding. Rather, he argues that the ALJ erred in failing to properly cite evidence to support finding that Gottron's impairments neither met nor equaled the listing for disability under Listing 11.04, Vascular Insults to the Brain, which is included under the neurological section of the Listing of Impairments. Doc. 7, p. 12, *see also* 20 C.F.R Pt. 404, Subpart P, App. 1, Section 11. The ALJ's decision belies this argument. *See* Tr. 17-18.

Vascular Insults to the Brain are characterized within Listing 11.04 in three ways: A.) Sensory or motor aphasia resulting in ineffective speech or communication persisting for at least 3 consecutive months after the insult; B.) Disorganization of motor function in two extremities resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, persisting for at least three consecutive months after the insult; or C.) Marked limitation in physical functioning *and* in one of the following areas of mental functioning, both persisting for at least three consecutive months after the insult:

> 1. Understanding, remembering, or applying information;
>
> 2. Interacting with others;
>
> 3. Concentrating, persisting, or maintaining pace; or
>
> 4. Adapting or managing oneself.

20 C.F.R. Pt. 404, Subpart P, App. 1 §11.04. The ALJ found Gottron's impairments severe but concluded that the record did not contain sufficient

evidence to find that he had an impairment, or combination thereof, that medically met or equaled the severity requirements of any listed impairment. Tr. 16-19. The ALJ explained that she examined and considered all of the entries in the listing of impairments with specific attention to Listings 11.02, Epilepsy; 11.04, Vascular insult to the brain; and 12.06, Anxiety disorders. Tr. 16, 20-21.

Gottron does not show how his impairments satisfy Listing 11.04, or any listing. The claimant bears the burden of establishing that his condition meets or equals a listing. *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 727-728 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)). A claimant thus "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Id.* at 728 (citing *Evans v. Sec'y of Health & Human Services*, 820 F.2d 161, 164) (6th Cir. 1987)). "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to 'meet' the listing." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). *See also* 20 C.F.R. §404.1525(c)(5) (A claimant is disabled if he meets or equals a listing); 20 C.F.R. §404.1525(d) (requiring Gottron to meet all of a listing's criteria in order to satisfy that listing). Gottron asserts "[t]he documentary evidence and his testimony supported the finding that he was seriously limited in his ability to

independently initiate, sustain, and complete work-related physical activities with his non-dominant left upper extremity." Doc No. 7, p. 12.  But he fails to articulate a theory, or subsection, under which he believes he has met his burden to meet or equal Listing 11.04, or any listing.[17] Instead, Gottron merely immediately repeats his assertion, substituting *medical evidence* for the phrase *documentary evidence and Gottron's testimony* without citation or specificity, before concluding that he "satisfied the criteria of the Listing necessitating a remand of this matter." Doc. No. 7, p. 12. Gottron has failed to articulate the Listing 11.04 subsection he believes he has met, let alone any criteria or specific medical or other finding which would satisfy the criteria under any such subsection.

In his reply brief purporting to further expand the arguments regarding Listing 11.04, Gottron similarly fails to provide sufficient evidence that showed he met or equaled the listing. Doc. No. 9, p. 1. He merely reiterates instances in the record where residual hand and arm issues are mentioned and argues

---

[17]    In the middle of his Listing 11.04 argument, Gottron, through counsel, interjects the argument that the ALJ erred in her residual functional capacity determination. Doc. 7, p. 12. Gottron's counsel knows better. She is an experienced Social Security practioner who regularly appears before this Court. Counsel has been previously warned to refrain from combining disparate challenges and arguments of the sequential disability evaluation together. *See, e.g.,* Case No. 1:21-cv-00556, Doc. No. 19, p. 34, n.7 (filed 3/2/2022); Case No. 5:20-cv-02850, Doc. No. 19, p. 34, n. 5 (filed 2/2/2022); *see also* Case No. 5:20-cv-01340, Doc. No. 21, p. 26, n. 9 (filed 8/16//2021); Case No. 1:20-cv-01186, Doc. No. 21, p. 25, n. 8 (filed 8/16/2021). Going forward, if counsel continues to present arguments in this manner, the Court may deem an argument waived or impose other appropriate sanctions.

that the ALJ failed to "include the totality of the findings from the cited records." Doc. No. 9, p. 1. Defendant correctly notes that Gottron's argument here was initially under-developed. Doc. No. 8, p. 7. It remained so in the reply brief. Doc. No. 9, p. 1. So Plaintiff's argument fails.

It may be that, as Defendant assumes for the sake of argument, Gottron intended to argue that he meets the requirements of Listing 11.04C. *See* Doc. No. 8, p. 7 (observing that Gottron might be arguing that he had a marked limitation in physical functioning, along with a marked limitation in one domain of mental function such that he met Listing 11.04C). Subsection C of Listing 11.04 requires a claimant to have marked limitation in physical functioning as well a marked limitation in at least two of the four areas of mental functioning listed above. 20 C.F.R. Pt. 404, Subpart P, App. 1 § 11.04C. Helpfully, the regulations provide guidance for the evaluation of limitations in physical and mental functioning under the neurological disorder listings. 20. C.F.R. Pt. 404, Subpart P, App. 1 § 11.00G2A (Explaining "[m]arked limitation and physical functioning"); 11.00G3A (providing examples of limitations in physical functioning). The regulations list examples of a marked limitation due to a neurological condition as one that seriously limits a claimant's use of "both upper extremities for fine and gross movements" or "one upper and one lower extremity." C.F.R. Pt. 404, Subpart P, App. 1 § 11.00G2A; Doc. No. 8, p. 7. Based on the guidance provided by the regulations and the record, the Plaintiff

has not met his burden to show that substantial evidence does not support the ALJ's finding. Tr. 22.

In contrast to Gottron's lack of specificity, the ALJ provided ample evidence in support of her decision. Tr. 22. The ALJ clearly considered all subsections of Listing 11.04, and all listings, and found Gottron's evidence unpersuasive. Tr. The ALJ found that Gottron's medically determinable impairments "could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Tr. 22. The ALJ cited instances in the record where Gottron reported weakness in his upper left extremity and other instances where he did not report such weakness. Tr. 20-22. The ALJ acknowledged Dr. Burgess's opinion and found it of limited persuasiveness, citing in her reasoning the opinion's vague declarations and its contradictions with Gottron's own statements. Tr. 21. The ALJ also acknowledged Gottron's mother's statement regarding Gottron's medical conditions and functionality but indicated that she found the statement unpersuasive and explained why. *Id*. The ALJ noted the opinions of the state agency doctors and noted instances of impairment as well as improvement. Tr. 21-22.

Although the ALJ's analysis at step three focused predominantly on Gottron's upper left extremity issues rather than his lower left extremity issues, so too do the majority of the records on which her decision is based.

Even so, the ALJ addressed Gottron's lower left side weakness, gait, and ability to ambulate. Doc. 20-22. Importantly, there is no heightened articulation standard at step three. *Bledsoe v. Barnhart*, 165 F. App'x. 408, 411 (6th Cir. 2006). The ALJ's decision, taken as a whole, sufficiently establishes support for her finding and amply displays her consideration of Gottron's lower left left limitations. The ALJ wrote, "The limitations associated with the lower left extremity are accommodated by the assigned postural and environmental limitations …. [E]vidence shows that he has a 4+-5/5 strength with normal tone in *all four* extremities and a normal gait." Tr. 22 (citing Exhibits 11F and 16F) (emphasis added).  There is thus substantial evidence in the record to support the ALJ's finding that Gottron did not meet Listing 11.04.

During Gottron's Listing 11.04 argument, Gottron objects to the ALJ's RFC determinations. Gottron writes that "when the vocational witness was asked the effect of a person being limited to only occasional handling and fingering of the non-dominant left hand, it was opined that all jobs would be eliminated." Doc. 7, p. 12. He argues that the ALJ's refusal to include this limitation in the RFC was "harmful error necessitating a remand of this matter."[18] Doc. No. 7, p.12. But Gottron ignores the ALJ's three-page RFC analysis. Worse, even assuming that the ALJ failed to include this limitation

---

[18]    Gottron also says, without explanation or citation, that "the medical evidence documented that Gottron was seriously limited in his ability to independently initiate, sustain, and complete work-related physical activities. As such, he satisfied the criteria of the Listing necessitating a remand of this matter." Doc. No. 7, p. 12.

in the RFC, Gottron makes no effort to show that the alleged error was harmful. Given the ALJ's thorough analysis, Gottron's underdeveloped argument fails.

*Listing 11.02.* Gottron's Listing 11.02, Epilepsy, argument is deemed waived. Arguments not raised in the appellant's main brief, or raised merely in a perfunctory manner, are deemed waived. *United States v. Lopez-Medina*, 461 F.3d 724, 743 (6th Cir. 2006) (*citing McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997)). On page two of Gottron's reply brief, he mentions Listing 11.02 for the first time, claiming that he "continued to have problems using his left upper extremities[19] … which would limit him to no more than occasional use." Doc. No. 9, p. 2. But Gottron neither specifies the problems to which he refers, nor clarifies the extremity he believes these problems limit. Nonetheless, he then asserts that he has "satisfied the criteria of Listing 11.02 necessitating an award of benefits or a remand of this matter." Doc. No. 9, p. 2.

Gottron's argument fails on several grounds. It is waived because Gottron did not include it in merits brief and because, once made, he presented

---

[19]     Gottron is mistaken in his employ of "extremities" here. The record is, in fact, quite clear that Gottron claims impairment in the upper extremity on his left side only, not both his left and right, a situation which would warrant the use of the plural. This is notable due to regulation 11.00G2A, which suggests a neurological impairment that seriously limits a claimant's use of "both upper extremities for fine and gross movements" as one that would satisfy Listing 11.04C's marked limitation criteria. C.F.R. Pt. 404, Subpart P, App. 1 11.00G2A.

it in an entirely perfunctory manner. And, even if the Court were to consider this argument on the merits, the record supports the ALJ's assessment. Listing 11.02, Epilepsy, requires a detailed description of a typical seizure and characterized by subsections A, B, C, or D. 20 C.F.R. Pt. 404, Subpart P, App. 1 § 11.02. As the ALJ observed, "the record … does not demonstrate a detailed description of a typical seizure." Tr. 16. As a result, as the ALJ found, Gottron's symptoms did not meet or equal the criteria for Listing 11.02. *Thacker*, 93 F. App'x at 727-728 (explaining that a claimant must show he meets or equals a listed impairment through the presentation of "specific medical findings satisfying the various tests" of the listing) (citing *Evans*, 820 F.2d at 164).

*Listing 12.06.* Under a heading purporting to discuss the ALJ's flawed analysis of the "totality of Gottron's impairments," Gottron challenges the ALJ's analysis of Gottron's impairments under Listing 12.06; Anxiety and Obsessive-Compulsive Disorders. Doc. No. 7, p. 1. The record, however, amply supports the ALJ's finding with respect to Listing 12.06, and Gottron has not met his burden to present specific medical findings that satisfy its criteria.

Anxiety and obsessive-compulsive disorders, defined in regulation 12.00B5, are satisfied within Listing 12.06 by meeting the criteria for subsection A and B, or A and C, as follows:

A. Medical documentation of the requirements of paragraph 1, 2, or 3:
   1. Anxiety disorder, characterized by three or more of the following; a.) Restlessness; b.) Easily fatigued; c.) Difficulty concentrating; d.) Irritability; e.) Muscle tension; or f.) Sleep disturbance; or
   2. Panic disorder or agoraphobia, characterized by one or both: a.) Panic attacks followed by a persistent concern or worry about

       additional panic attacks or their consequences; or b.) Disproportionate fear or anxiety about at least two different situations (for example, using public transportation, being in a crowd, being in a line, being outside of your home, being in open spaces); or

3. Obsessive-compulsive disorder, characterized by one or both: a.) Involuntary, time-consuming preoccupation with intrusive, unwanted thoughts; or b.) Repetitive behaviors aimed at reducing anxiety;

AND

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: 1.) Understand, remember, or apply information; 2.) Interact with others; 3.) Concentrate, persist, or maintain pace; 4.) Adapt or manage oneself.

OR

C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both: 1.) Medical treatment, mental health therapy, psychosocial supports, or a highly structured settings that is ongoing and that diminishes the symptoms and signs of your mental disorder; and 2.) Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life.

20 C.F.R. Pt. 404, Subpart P, App. 1 §12.06.

The ALJ found that "the severity of [Gottron]'s mental impairment did not meet or medically equal the [above-listed] criteria." Tr. 17. The ALJ considered whether Gottron satisfied Subsection B or Subsection C and found that he did not, primarily citing Gottron's self-reporting and statements in his Adult Function Report. Tr. 17. First, the ALJ assessed the record against the criteria of Subsection B1 and found that Gottron had moderate limitations in his ability to understand, remember, or apply information due to his mental

27

impairments. Tr. 17 (citing Tr. 265-266). Second, the ALJ assessed the record against the criteria of Subsection B2 and found Gottron had moderate limitations in his ability to interact with others due to his mental impairments. Tr. 17 (citing Tr. 266). Third, the ALJ assessed the record against the criteria of Subsection B3 and found Gottron had moderate limitations in concentration, persistence, or pace due to his mental impairments. Tr. 18 (citing Tr. 267-268). Finally, when the ALJ addressed the criteria of Subsection B4, she found that Gottron had moderate limitations in his ability to adapt or manage [himself] due to his mental impairments. Tr. 18 (citing Tr. 263-264).

The ALJ also considered whether Gottron satisfied the criteria in Listing 12.06C and found that he did not. Tr. 19. She found the record neither provided sufficient evidence of a "serious and persistent" mental disorder as defined within the listing, nor demonstrated that Gottron's impairments, individually or in combination, rose to the level of severity required to satisfy Listing 12.06, or any listing. Tr. 19.

Importantly, when addressing 12.06B, the ALJ acknowledged the opinion of a State doctor whose assessment indicated Gottron was less limited than the ALJ's findings. Tr. 18. The ALJ explained that, in the context of the record as a whole—or, taking into consideration the "totality of Gottron's impairments," Doc. No. 7, p. 1—the evidence supported a finding that Gottron had greater limitations than those assessed by the State doctor. Tr. 18, 65, 75, 87, 95. Nonetheless, the ALJ determined Gottron's limitations did not meet or

equal Listing 12.06, Subsection B, because his mental impairment did not cause at least two "marked" limitations or one "extreme" limitation. Tr. 18. This illustrates that the ALJ did not err in her assessment of Gottron's impairments under Listing 12.06, or any listing, and took into consideration the totality of his impairments when making her ruling.

**The ALJ did not violate Social Security Ruling 16-3p.**

Social Security Ruling (SSR) 16-3 provides that an ALJ evaluates a claimant's subjective reports of symptoms by considering the claimant's complaints along with the objective medical evidence, treatment received, daily activities, and other evidence. Social Security Ruling 16-3p Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at 5-8 (Oct. 25, 2017). Gottron argues that the ALJ violated SSR 16-3p by failing to properly consider his symptoms. Doc. No. 7, p. 16-19.

First, Gottron does not cite the portion of SSR 16-3p he claims the ALJ violated. He also does not specifically challenge the ALJ's findings, instead merely arguing without citation that the ALJ "disregarded any medical findings which would have precluded Gottron from engaging in substantial gainful activity on a full time and sustained basis." Doc. No. 7, p. 18.

Second, Gottron's argument is belied by the record. The ALJ considered Gottron's complaints (in his hearing testimony and self-reported function report), the objective medical evidence (exam findings, diagnoses, physical therapy notes and testing), treatment he received (medication, physical

29

therapy, emergency room visit notes), daily activities, medical opinions, and the function report completed by Gottron's mother. Tr. 17-22. The ALJ concluded that, based on analysis of the foregoing—including Gottron's comments on his progress to his clinicians throughout his treatment—that his condition with respect to his upper left extremity was improving and was not as limited as he alleged in his testimony at the hearing. Tr. 20-22. Gottron's assertion that the ALJ "failed to make a conclusion about Gottron's statements" is mistaken and his argument fails. The ALJ also articulated specific reasons for discounting Gottron's testimony, citing many of his own statements which contradicted what the ALJ classified as the "vague" opinion of Dr. Burgess.  Tr. 21. Gottron's assertion that this was merely boilerplate therefore fails. *Id*. Gottron has thus not shown that the ALJ violated SSR 16-3p.

**Conclusion**

For the reasons explained above, I recommend that the Commissioner's decision be affirmed.

Date: October 5, 2022

s/ James Grimes

James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).